UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GARRETT DAY LLC | ) | CASE NO. _____ |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEVELOPMENT SERVICES | ) | |
| AGENCY, | ) | JUDGE _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL PAPER COMPANY, | ) | |
| | ) | |
| NEENAH PAPER, INC., | ) | |
| | ) | (JURY DEMAND ENDORSED HEREON) |
| AETNA PAPER COMPANY, | ) | |
| | ) | |
| BADGER PAPER MILLS, INC., | ) | |
| | ) | |
| BPM PAPER, INC., | ) | |
| | ) | |
| BROWNFIELD CHARITIES, INC., | ) | |
| | ) | |
| CHAMPION INTERNATIONAL CORP., | ) | |
| | ) | |
| CROSS POINTE PAPER CORPORATION, | ) | |
| | ) | |
| DAYTON PAPER CORPORATION, | ) | |
| | ) | |
| FRASER PAPERS, INC., | ) | |
| | ) | |
| FOX RIVER PAPER COMPANY, | ) | |
| | ) | |
| FOX RIVER PAPER SALES COMPANY, | ) | |
| | ) | |
| FOX VALLEY CORPORATION, | ) | |
| | ) | |
| HARRISON HOLDINGS, L.P., *formerly known as* | ) | |
| *Howard Paper Group, L.P.*, | ) | |
| | ) | |
| HOWARD PAPER MILLS, INC., | ) | |
| | ) | |
| HPM INVESTORS, INC., *formerly known as* | ) | |

| | |
|---|---|
| *Howard Paper Mills, Inc.*, | ) |
| | ) |
| HPP, INC., *formerly known as Howard Paper Partners, Inc.*, | ) ) |
| | ) |
| ST. REGIS PAPER COMPANY, | ) |
| | ) |
| TWIN RIVERS PAPER COMPANY, INC., | ) |
| | ) |
| and | ) |
| | ) |
| WARRIOR RIVER PAPER COMPANY, INC., | ) |
| | ) |
| | ) |
| Defendants. | ) |

# COMPLAINT

Plaintiffs Garrett Day LLC and the Ohio Development Services Agency (collectively, "Plaintiffs"), for themselves and as assignees of the City of Dayton, allege the following:

## Parties

1. Plaintiff Garrett Day LLC ("Garrett"), a limited liability corporation, is organized and existing under the laws of the State of Ohio and maintains its principal place of business at 163 Kentucky Avenue, Lexington, Kentucky.

2. The Ohio Development Services Agency ("DSA") is an agency of the State of Ohio, a body politic governed by the Constitution and laws of Ohio.

3. The City of Dayton is a non-party who, pursuant to an agreement in 2015 (the "Assignment"), assigned to Garret and the DSA any and all claims, demands and causes of action against the defendants hereto that relate in any way to the site that is the subject of this lawsuit.

4. Defendant International Paper Company ("International Paper") is a New York Corporation with its principal place of business in Memphis, Tennessee.

5. Defendant Neenah Paper, Inc. ("Neenah Paper") is a Delaware Corporation with its principal place of business near Atlanta, Georgia.

6. Defendant Aetna Paper Company ("Aetna Paper") was an Ohio Corporation with its principal place of business in Dayton, Ohio.

7. Defendant Badger Paper Mills, Inc. ("Badger Paper") was a Wisconsin Corporation with its principal place of business in Peshtigo, Wisconsin.

8. Defendant BPM Paper, Inc. ("BPM") is a Wisconsin Corporation with its principal place of business in Peshtigo, Wisconsin.

9. Defendant Brownfield Charities, Inc. ("Brownfield") is an Ohio Corporation with its principal place of business in Washington Township, Montgomery County, Ohio.

10. Defendant Champion International Company ("Champion") was a New York Corporation with its principal place of business in New York, New York.

11. Defendant Cross Pointe Paper Corporation ("Cross Pointe") was a Minnesota Corporation with its principal place of business in St. Paul, Minnesota.

12. Defendant Dayton Paper Corporation ("Dayton Paper") was a Minnesota Corporation with its principal place of business in St. Paul, Minnesota.

13. Defendant Fox River Paper Company ("Fox River") was a Delaware Corporation with its principal place of business in Appleton, Wisconsin.

14. Defendant Fox River Paper Sales Company ("Fox River Sales") was a Delaware Corporation with its principal place of business in Appleton, Wisconsin.

15. Defendant Fox Valley Corporation ("Fox Valley") was a Wisconsin Corporation with its principal place of business in Appleton, Wisconsin.

16. Defendant Fraser Papers, Inc. ("Fraser Papers") is a Delaware Corporation with its principal place of business in Stamford, Connecticut.

17. Defendant Harrison Holdings, L.P. ("Harrison Holdings"), formerly known as Howard Paper Group, L.P. ("Howard Paper Group), was a Delaware Limited Partnership with its principal place of business in Kalamazoo, Michigan.

18. Defendant Howard Paper Mills, Inc. ("Howard Paper Mills, Inc. I") was an Ohio Corporation with its principal place of business in Dayton, Ohio.

19. Defendant HPM Investors, Inc., formerly known as Howard Paper Mills, Inc. ("Howard Paper Mills, Inc. II") was a Delaware Corporation with its principal place of business in Kalamazoo, Michigan.

20. Defendant HPP, Inc., formerly known as Howard Paper Partners, Inc. ("Howard Paper Partners") was an Ohio Corporation with its principal place of business in Dayton, Ohio.

21. Defendant St. Regis Paper Company ("St. Regis") was a New York Corporation with its principal place of business in New York, New York.

22. Defendant Twin Rivers Paper Company Corporation ("Twin Rivers") is a Delaware Corporation with its principal place of business in Madawaska, Maine.

23. Defendant Warrior River Paper Company, Inc. ("Warrior River") was a Delaware Corporation with its principal place of business in Dayton, Montgomery County, Ohio.

**Jurisdiction and Venue**

24. Jurisdiction is proper for this Court pursuant to 28 U.S.C. § 1331. This court also has subject matter jurisdiction over the first claim under 42 USC § 9613(b).

25. The Court has supplemental jurisdiction over the pendant state law claim pursuant to 28 U.S.C. § 1367 because the state law claim is related to the federal claim.

26. Venue is proper as the affected property is located in Dayton, Ohio, within the Southern District. 42 USC § 9613(b) and 28 USC § 1391(b) and (c).

### Ownership and Operational History

27. 354 South Edwin C. Moses Boulevard, Dayton, Montgomery County, Ohio is the site of a former paper mill ("Site").

28. Upon information and belief, the Site has contained a paper mill since prior to 1896, first operated by The White Paper Company, which no longer exists.

29. In 1896, the Site was conveyed to one Herman H. Hoffman ("Hoffman"). Upon information and belief, Hoffman was the president of the Aetna Paper Company ("Aetna Paper"). In 1918, Hoffman conveyed the Site to Aetna Paper.

30. During its operations at the Site, Aetna Paper, a non-integrated paper mill, produced writing and envelope paper. Specifically, Aetna made glazed and unglazed white bond paper, white writing paper and a variety of colored paper at the Site. At one time, Aetna Paper had two paper machines on Site, including a Fourdinier paper machine.

31. On February 16, 1946, Aetna Paper merged with the Howard Paper Company. Through the transaction, the Howard Paper Company was merged out of existence. Upon merging, Aetna took the new name Howard Paper Mills, Inc. ("Howard Paper Mills, Inc. I"). From 1946 to 1960, Howard Paper Mills, Inc. I continued to operate a non-integrated paper mill at the Site.

32. Upon information and belief, St. Regis Paper Company ("St. Regis Paper") purchased Howard Paper Mills, Inc. I in 1960. Through the transaction, Howard Paper Mills, Inc. I merged out of existence. Thereafter, St. Regis Paper operated a non-integrated paper mill at the Site.

33. In January 1972, St. Regis sold the Site and related assets to Howard Paper Mills, Inc. (Howard Paper Mills, Inc. II). Upon information and belief, Howard Paper Mills, Inc. II was incorporated by one Ward D. Harrison ("Harrison") and named after the former Howard Paper Mills, Inc. I. Upon information and belief, neither Harrison nor Howard Paper Mills, Inc. II is affiliated with the former Howard Paper Mills, Inc. I. St. Regis survived the transaction, and, in 1984, was acquired by Champion International Corporation ("Champion"), which, in turn, was acquired by International Paper Company ("International Paper") in 2000.

34. In 1989, Howard Paper Mills, Inc. II conveyed the Site to Howard Paper Group, Limited Partnership ("Howard Paper Group"). Upon information and belief, Howard Paper Mills, Inc. II subsequently changed its name to HPM Investors, Inc. Howard Paper Group's president was Frederick W. Harrison, the son of the late Ward D. Harrison the founder of Howard Paper Mills, Inc. II.

35. Upon information and belief, Warrior River Paper Company, Inc. ("Warrior River") and Howard Paper Partners Inc. ("Howard Paper Partners") were general partners of Howard Paper Group and may have directly participated in the operations of the Site.

36. On June 1, 1991, Howard Paper Group sold its business, including the rights to its trade name, to Fox Valley Corporation, Fox River Paper Company, and Fox River Paper Sales Company (collectively, "Fox River Paper") through an asset purchase agreement. While the Fox River Paper purchase agreement was labeled as an asset purchase agreement, Fox River Paper took over Howard Paper Mills, Inc.'s business, using the same employees and same production process and creating the same type of paper at the same mill. Following the agreement, Howard Paper Group no longer operated in any capacity except briefly as a lessor of the Site and one machine to Fox River Paper.

37. On April 10, 1992, Fox River Paper sold its assets at the Site to Badger Paper Mills Inc. ("Badger Paper"). Likewise, Howard Paper Group, by then known as Harrison Holdings, L.P. ("Harrison Holdings"), a Delaware Limited Partnership, conveyed the Site and the previously leased machine to Badger Paper. Fox River Paper retained the trade name "Howard Paper," and its successor continues to produce "Howard Linen Papers." Badger Paper purchased the Site for the purpose of increasing their production of free-sheet paper, such as commonly used printer paper and business form paper products. The State of Ohio canceled Badger Paper Mills' Articles of Incorporation/Certificate of Authority on March 12, 2009. Upon information and belief, Badger Paper Mills dissolved in 2010 and was reformulated as BPM, Inc. ("BPM").

38. In 1993 Badger Paper conveyed the Site to Dayton Paper Corporation ("Dayton Paper"), a Minnesota Corporation, through an agreement for sale and purchase of assets.

39. In 1996, Dayton Paper merged with and/or through Cross Pointe Paper Corporation ("Cross Pointe") into Fraser Papers, Inc. ("Fraser Papers").

40. Upon information and belief, Twin Rivers Paper Company Corporation ("Twin Rivers") is the successor in interest to Dayton Paper through its acquisition of Fraser Papers.

41. Upon information and belief, Dayton Paper and Fraser Papers were the last entities that operated the Site as a paper mill.

42. In 2001, Fraser Papers conveyed the Site to Brownfield Charities, Inc. ("Brownfield"), an Ohio Corporation.

43. On July 1, 2010, Brownfield conveyed the Site to Garrett. At the time Garrett received title to the Site, the Site contained structurally unsafe structures, was no longer fit to be habitable, and was a hazard and menace to the public.

**Current Status of Former Owners and Operators**

44. Upon information and belief, through Howard Paper Company, Inc. I, Aetna Paper, St. Regis, and Champion, and/or directly, International Paper owned and operated the Site from at least 1918 through 1972.

45. Through Howard Paper Group, Warrior River, Howard Paper Partners, Howard Paper Mills, Inc. II, and Fox River Paper and/or directly, Neenah Paper owned and operated the Site from 1972 to 1992.

46. Through Badger Paper Mills, Inc., and directly, BPM owned and operated the Site from 1992 to 1993.

47. Through Dayton Papers, Cross Pointe, and Fraser Papers, and/or directly Twin Rivers owned and operated the Site from 1993 to 2001.

48. Brownfield owned and operated the Site from 2001 until it conveyed the Site to Garrett in 2010.

49. The predecessors in interest for International Paper, Neenah Paper, Badger Mills Paper and Twin Rivers are each named as defendants herein to the extent necessitated by their successor's denial of successor liability. To the extent the successor entities stipulate to successor liability, their predecessors may be dismissed.

**The Operation and Contamination of the Site**

50. Paper is uniformly produced through a process of pulp blending, draining and drying; however, the materials used in the paper making process and the preparation of those materials vary greatly, creating many different types of paper.

51. Between 1918 and 1989, white and colored paper was produced at the Site from pulp that was prepared off site. The on-Site work involved pouring the watery, already prepared

- 8 -

pulp mix into the headbox of the Fourdinier machine and removing the water from the pulp through gravity and vacuums as the pulp moved over a belt. The paper was then pressed together through a series of rollers, which also acted to remove any excess water. The paper then moved through a series of steam heated rollers to dry. Coatings like gloss, color, brilliance, and other desired features would be applied at that point.

52. At the Site, water released during this process would have included fibers and additives.

53. When the Site transitioned to the production of recycled paper in 1989, the operator began preparing the used material for the paper making process on Site. On Site preparation continued thereafter until paper was no longer produced at the Site.

54. From 1989 to at least 1993, on Site preparation began with the placement of recycled waste or "broke" into a pulper. The pulper utilized blades to cut the pieces of waste paper while water, chemicals and heat were added to aid in the process of reducing the paper to its original state. The broke, which would now be an oatmeal-like mixture, was then screened to remove unwanted particles. The mixture was then cleaned to further remove unwanted particles like the coatings and additives that were added to the original paper. A de-inking process was used to further purify the pulp from any adhesives or dyes that still remained in the fibers. Before proceeding to the paper machine, the broke was then treated with bleaching agents to brighten or whiten the pulp.

55. Throughout the operational history of the Site, the paper production process required the use of hazardous substances and chemicals. The heavy machinery that was used required significant amounts of water and heat, which required that the machines on Site be insulated with asbestos. To prevent corrosion and maintain capacity, care of the machines

included parts washing, a process which used trichloroethylene (TCE). Asbestos and TCE are hazardous substances found at the Site.

56. The chemical pulping process used at the Site involved well known chemicals found in bleaching agents. At various times, the Site produced white bond and writing paper. Elemental chlorine, widely used until the 1990s, would have been added to achieve the brilliant white color demanded by the market. Earlier production would have involved the use of bleaching additives to the broke to produce a white finish. Bleaching agents would have been released into the air as the paper proceeded through the drying process. The virgin pulp added to the broke mixture also would have been treated with other bleaching agents and chemicals.

57. The paper making process also used significant amounts of energy, which required transformers on the Site. Releases from transformers lead to significant PCB contamination of the Site. The energy demand also resulted in contamination of the Site from fuel oil and coal leachate.

58. Chromium is used in the manufacturing of dyes and found in synthetic materials. The recycled waste containing Chromium and Barium would have been released from the waste during the de-inking process, separating, then floating above the saturated broke. Chromium is insoluble in water and would have been removed with the floating, unwanted particles during the de-inking process and disposed of. Barium would have been drained with the remaining water and treated.

59. Polycyclic Aromatic Hydrocarbons (PAHs) were found on the site. PAHs can be produced when petroleum or coal was partially burned. Coal and petroleum, which were used as heat and fuel sources on the Site, were found in massive quantities at the Site. Additionally, PAHs would have been released from the ash residue of the coal used to power the paper drying

process. Benzo (a) anthracene, Benzo(a)pryene, Benzo(b)fluoranthene, Chrysene, Pyrene, Dibenz (a,h)anthracene, Indeno(1,2,3-cd) pyrene, and phenanthrene are PAHs and were found in the soil at the Site. Flouranthene is found in coal tar and found in the soil at the site.

60. The operations at the Site also utilized asbestos containing building material, above ground storage tanks for fuel oil, a oil pump house, a machine shop, two gasoline above ground storage tanks, a former tool manufacturing facility, two hydraulic machines, a PCB capacitor, a powerhouse and air compressor, a 300 horse power engine, a used oil tote stored on-Site, a hydraulic man-lift, a hydraulic elevator, a coal storage area, and PCB content in oils & greases.

61. Asbestos, TCE, PAHs and PCBs are hazardous substances under the Ohio Voluntary Action Program ("VAP"), Ohio Revised Code 3746 and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 USC 9602.

62. Each of the hazardous substances used or produced at the Site were either released or a threat for release from at least 1918 to as late as 2010.

### Remediation of the Site

63. Garrett purchased the Site in 2010. At that time, the remnants of several buildings and a large smoke stack remained.

64. Beginning in 2010, Garrett, in conjunction with the DSA and the City of Dayton, undertook efforts to remediate the contamination of the Property and protect public health and safety. Such efforts included without limitation:

    a. identifying potential sources of contamination;

    b. investigating the nature and extent of contamination;

    c. preparing a remedial plan;

    d. conducting the remedial activities; and,

    e. causing a no further action letter to be prepared.

65. Such activities were conducted in accordance with VAP Standards and CERCLA's National Contingency Plan.

66. In connection with such activities, Plaintiffs expended in excess of $1.7 million.

**Past and Future CERCLA Response Costs and Contribution**

67. Through paper-making operations, hazardous substances were released and/or disposed of at the Site during International Paper's ownership or operation of the Site and Neenah Paper's ownership or operation of the Site within the meaning of § 107(a) (2) of CERCLA, 42 USC § 9607 (a) (2).

68. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 USC § 9601(9).

69. During Defendants' operations, there were releases or threatened releases of hazardous substances, including but not limited to PCB, PAHs and TCE, at the Site within the meaning of § 101(22) and § 101(14) of CERCLA, 42 USC §§ 9601 (22), (14).

70. As a result of releases or threatened releases of hazardous substances at the Site, Plaintiffs incurred necessary costs of response, including but not limited to, Phase I and Phase II reports, soil and groundwater sampling, and general remediation work that was approved by all concerned.

71. All of the response costs incurred by Plaintiffs at the Site were incurred consistent with the National Contingency Plan, 42 USC § 9605(a) and codified at 40 CFR Part 300.

72. Sections 107(a) (2) and (a) (4) (B) of CERCLA, 42 USC §§ 9607(a) (2), (a) (4) (B), provide that any person who at the time of disposal of any hazardous substance owned or

operated a facility at which such hazardous substances were disposed of is liable to "any person" who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP. As such, Defendants are liable to Plaintiffs for all necessary costs of response under CERCLA §§ 107(a)(2), (a)(4) (B), 42 USC §§ 9607(a)(2), (a)(4)(B) and/or for contribution under CERCLA § 113(f), 42 USC § 9613(f).

73. Plaintiffs are also entitled to statutory interest pursuant to CERCLA § 107(a)(4), 42 USC § 9607(a)(4)**.**

### Voluntary Action Program Response Costs

74. Investigations and remediation of hazardous substance contamination at the Site were conducted in accordance with Ohio's Voluntary Action Program ("VAP") codified at ORC § 3746 and applicable regulations. A No Further Action (NFA) letter was issued on February 13, 2012 and a Covenant Not to Sue was granted on July 5, 2012.

75. Plaintiffs have incurred in excess of $1.7 million in the course of conducting a voluntary action pursuant to ORC § 3746.23(A). Plaintiff Garrett has further incurred significant legal expenses associated with this action.

76. The VAP activities addressed hazardous substances released by each of the Defendants during their respective ownership and/or operation of the Site. The substances released, including but not limited to asbestos, TCE and PCBs, are considered hazardous substances under ORC § 3746.01(I).

77. Based on these facts, Defendants are liable for the costs of the voluntary action under ORC §§ 3746.23(A) (1-7), (B), including but not limited to, investigative work, preparation of Phase I and Phase II reports, remedial activities, reasonable attorney fees, other expenses associated with this action.

**Nuisance**

78. The acts, omissions and conduct of Defendants, collectively and individually, created and maintained a continuing nuisance at the Site.

79. Plaintiffs directly and through their assignee expended abatement costs and incurred other damages as result of the nuisance.

80. Plaintiffs are entitled to recover such costs and damages under common law principles and/or the ORC.

**Demand for Relief**

WHEREFORE, Plaintiffs demand: (1) a judgment in their favor in the amount of all costs incurred relating to the Site; (2) the attorneys' fees and costs incurred in prosecuting this action; and, (3) such additional and further relief that the Court deems appropriate.

Respectfully submitted,

MICHAEL DEWINE
OHIO ATTORNEY GENERAL

s/Jeremy M. Grayem
Jeremy M. Grayem (0072402)

ICE MILLER LLP
250 West Street
Columbus, OH  43215
P: (614) 462-2284
F: (614) 222-3440
Jeremy.Grayem@icemiller.com

Trial Attorney for Plaintiff, the Ohio
Development Services Agency

s/Jeremy M. Grayem
Jeremy M. Grayem
Attorney No. 72402

ICE MILLER LLP
250 West Street
Suite 700
Columbus, OH  43215
(614) 462-2284
Jeremy.Grayem@icemiller.com

Trial Attorney for Plaintiff
Garrett Day LLC

Of Counsel:

Brent W. Huber
(Indiana Attorney No. 16077-53)
Nicholas B. Reuhs
(Indiana Attorney No.  31181-49)

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282
P: (317) 236-5942
F: (317) 592-4822
E-mail:  Brent.Huber@icemiller.com
E-mail: Nicholas.Reuhs@icemiller.com

(Both Will Seek *Pro Hac Vice* Admission)

### **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs request a jury trial for all issues so triable.

Respectfully submitted,

s/Jeremy M. Grayem
Jeremy M. Grayem

I\4640653.9