**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| GARRETT DAY LLC | ) | Case No. 3:15-cv-00036-WHR |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEVELOPMENT SERVICES | ) | |
| AGENCY, | ) | Judge Walter H. Rice |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL PAPER COMPANY, | ) | |
| | ) | |
| NEENAH PAPER, INC., | ) | |
| | ) | |
| BADGER PAPER MILLS, INC., | ) | |
| | ) | |
| BROWNFIELD CHARITIES, INC., | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| FOX RIVER PAPER COMPANY, | ) | |
| | ) | |
| FOX RIVER PAPER SALES COMPANY, | ) | |
| | ) | |
| FOX VALLEY CORPORATION, | ) | |
| | ) | |
| HARRISON HOLDINGS, L.P., *formerly known as* | ) | |
| *Howard Paper Group, L.P.*, | ) | |
| | ) | |
| HPM INVESTORS, INC., *formerly known as* | ) | |
| *Howard Paper Mills, Inc.*, | ) | |
| | ) | |
| HPP, INC., *formerly known as Howard Paper* | ) | |
| *Partners, Inc.*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WARRIOR RIVER PAPER COMPANY, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

I9754474.10

## FIRST AMENDED COMPLAINT

Plaintiffs Garrett Day LLC and the Ohio Development Services Agency (collectively, "Plaintiffs"), for themselves and as assignees of the City of Dayton, allege the following:

### Parties

1.      Plaintiff Garrett Day LLC ("Garrett"), a limited liability corporation, is organized and existing under the laws of the State of Ohio and maintains its principal place of business at 163 Kentucky Avenue, Lexington, Kentucky.

2.      Plaintiff Ohio Development Services Agency ("DSA") is an agency of the State of Ohio, a body politic governed by the Constitution and laws of Ohio.

3.      The City of Dayton is a non-party who, pursuant to an agreement in 2015 (the "Assignment"), assigned to Garrett and the DSA any and all claims, demands and causes of action against the Defendants hereto that relate in any way to the site that is the subject of this lawsuit.

4.      Defendant International Paper Company ("International Paper") is a New York Corporation with its principal place of business in Memphis, Tennessee.

5.      Defendant Neenah Paper, Inc. ("Neenah Paper") is a Delaware Corporation with its principal place of business near Atlanta, Georgia.

6.      Defendant Badger Paper Mills, Inc. ("Badger Paper") was a Wisconsin Corporation with its principal place of business in Peshtigo, Wisconsin.

7.      Defendant Brownfield Charities, Inc. ("Brownfield") is an Ohio Corporation with its principal place of business in Washington Township, Montgomery County, Ohio.

- 2 -

8.    Defendant Fox River Paper Company ("Fox River") was a Delaware Corporation with its principal place of business in Appleton, Wisconsin.

9.    Defendant Fox River Paper Sales Company ("Fox River Sales") was a Delaware Corporation with its principal place of business in Appleton, Wisconsin.

10.    Defendant Fox Valley Corporation ("Fox Valley") was a Wisconsin Corporation with its principal place of business in Appleton, Wisconsin.

11.    Defendant Harrison Holdings, L.P. ("Harrison Holdings"), formerly known as Howard Paper Group, L.P. ("Howard Paper Group"), was a Delaware Limited Partnership with its principal place of business in Kalamazoo, Michigan.

12.    Defendant HPM Investors, Inc., formerly known as Howard Paper Mills, Inc. ("Howard Paper Mills, Inc. II") was a Delaware Corporation with its principal place of business in Kalamazoo, Michigan.

13.    Defendant HPP, Inc., formerly known as Howard Paper Partners, Inc. ("Howard Paper Partners") was an Ohio Corporation with its principal place of business in Dayton, Ohio.

14.    Defendant Warrior River Paper Company, Inc. ("Warrior River") was a Delaware Corporation with its principal place of business in Dayton, Montgomery County, Ohio.

<u>**Jurisdiction and Venue**</u>

15.    Jurisdiction is proper for this Court pursuant to 28 U.S.C. § 1331.  This Court also has subject matter jurisdiction over the first claim under 42 U.S.C. § 9613(b).

16.    The Court has supplemental jurisdiction over the pendant state law claim pursuant to 28 U.S.C. § 1367 because the state law claim is related to the federal claim.

17.    Venue is proper as the affected property is located in Dayton, Ohio, within the Southern District.  42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) and (c).

- 3 -

## Ownership and Operational History

### *a. Prior to 1918*
### *(The White Paper Company)*

18.     354 South Edwin C. Moses Boulevard, Dayton, Montgomery County, Ohio is the site of a former paper mill ("Site").

19.     Upon information and belief, the Site has contained a paper mill since prior to 1896, first operated by The White Paper Company, which no longer exists.

20.     In 1896, the Site was conveyed to one Herman H. Hoffman ("Hoffman").  Upon information and belief, Hoffman was the president of the Aetna Paper Company ("Aetna Paper").

### *b.  1918-1972*
### *(International Paper)*

21.     In 1918, Hoffman conveyed the Site to Aetna Paper.

22.     During its operations at the Site, Aetna Paper, a non-integrated paper mill, produced writing and envelope paper.  Specifically, Aetna made glazed and unglazed white bond paper, white writing paper and a variety of colored paper at the Site.  At one time, Aetna Paper had two paper machines on Site, including a Fourdinier paper machine.

23.     On February 16, 1946, Aetna Paper merged with the Howard Paper Company.  Through the transaction, the Howard Paper Company was merged out of existence.  Upon merging, Aetna took the new name Howard Paper Mills, Inc. ("Howard Paper Mills, Inc. I").  From 1946 to 1960, Howard Paper Mills, Inc. I continued to operate a non-integrated paper mill at the Site.

- 4 -

24.     St. Regis Paper Company ("St. Regis Paper") purchased Howard Paper Mills, Inc. I in 1960.   Through the transaction, Howard Paper Mills, Inc. I merged out of existence. Thereafter, St. Regis Paper operated a non-integrated paper mill at the Site.

25.     St. Regis was acquired by Champion International Corporation ("Champion") in 1984.

26.     In turn, Champion was acquired by International Paper in 2000.

27.     Champion, Aetna Paper, Howard Paper Mills I and St. Regis (the "IP Predecessors") have all been merged into International Paper who now stands in their shoes for purposes of the claims in this proceeding.

28.     International Paper has conceded as much, noting in its prior filings in this action that, "because all of the IP Predecessors have been formally merged into IP (or its predecessors), they are no longer proper parties to this proceeding . . . there is no legal justification for their inclusion as separate parties, as they have all been merged into IP (or its predecessors), who now stands in their shoes for purposes of the claims in this proceeding."   See Motion to Dismiss IP Predecessors, Docket Entry #76, at p. 5.

29.     Because International Paper has succeeded to the liabilities and obligations of the IP Predecessors, International Paper is named as defendant in this action in lieu of the IP Predecessors.

### c.  1972-1992
### (Howard Paper Mills & Neenah Paper)

30.     In January 1972, St. Regis sold the Site and related assets to Howard Paper Mills, Inc. (Howard Paper Mills, Inc. II). *a.k.a.* HPM Investors.

31.     In 1989, Howard Paper Mills, Inc. II was acquired by Howard Paper Group. Upon information and belief, Warrior River and Howard Paper Partners were general partners of Howard Paper Group and may have directly participated in the operations of the Site.

32.     On June 1, 1991, Howard Paper Group sold its business, including the rights to its trade name, to Fox Valley Corporation, Fox River Paper Company, and Fox River Paper Sales Company (collectively, "Fox River Paper") through a purported asset purchase agreement.

33.     While the Fox River Paper purchase agreement was labeled as an asset purchase agreement, Fox River Paper took over Howard Paper Mills, Inc.'s entire business. Put another way, the transaction represented a complete acquisition of Howard Paper Group's operations and business by Fox River Paper.

34.     Following the transaction, Fox River Paper used same production process as Howard Paper, creating the same type of paper at the same mill.

35.     Following the transaction, Fox River Paper used the same employees as Howard Paper Group.

36.     Following the transaction, Howard Paper Group no longer operated in any capacity except briefly as a lessor of the Site and sold one machine to Fox River Paper. Moreover, Howard Paper Group signed a noncompetition agreement, effectively preventing Howard Paper from continuing its business.

37.     Following the transaction, Fox River Paper used the trade name "Howard Paper," selling "Howard Linen Paper" to Howard Paper Group's customers.

38.     Fox River Paper directly assumed Howard Paper Group's ongoing contractual obligations, including Howard Paper Group's performance obligations to customers, trade payables, health care and COBRA obligations to employees and warranty liabilities.

- 6 -

39.     Contemporaneous accounts, based upon releases by Fox River Paper, couched the transaction as an acquisition.  For instance, the leading industry publication wrote:  "Fox River Paper Corp. in late June said it completed its acquisition of Howard Paper Mills Inc. of Ohio, and the newly acquired company will be known as Howard Paper, a division of Fox River Paper." *Fox River completes Howard Paper purchase.* PULP & PAPER, Vol v65 n8, Aug. 1, 1991, *available at* 1991 WLNR 4751542.  Fox River Paper's local paper reported:  "The Fox River Paper Co., of Appleton, announced it has signed a letter of intent to acquire Howard Paper Mills in Dayton, Ohio."  Madison (Wis.) CAPITAL TIMES, May 9, 1991, *available at* 1991 WLNR 1876764.

40.     Upon information and belief, the most material aspect of the Howard Paper Group that was purportedly not transferred to Fox River Paper was Howard Paper Group's environmental liabilities (which were almost certainly known to the parties at the time).

41.     Put simply, Fox River Paper and Howard Paper Group amounted to a *de facto* merger or consolidation.

42.     Moreover, because of the complex nature of the transaction, discovery may reveal additional grounds for successor liability.

43.      On April 10, 1992, after operating the Site for almost a year, Fox River Paper sold its assets at the Site to Badger Paper.  Likewise, Howard Paper Group (who has remained as a straw man owner of the Site and machines), conveyed the Site and the previously leased machine to Badger Paper.

44.     Neenah Paper acquired Fox River Paper in March 2007.

45.     While Plaintiffs are not privy to the actual transaction documents, on February 6, 2007, Neenah Paper issued the following press release:  "Neenah Paper, Inc. announced today it

has signed a definitive agreement to purchase the Fox Valley Corporation, which owns Fox River Paper Company, LLC ("Fox River") . . . Closing is expected to occur in the first quarter."

46.     Similarly, a footnote (a) to Neenah Paper's 2007 Financial Statement, as disclosed in its annual report notes:  "In March 2007, we acquired the stock of Fox Valley Corporation and its subsidiary, Fox River Paper Company, LLC (collectively, "Fox River") for approximately $54.7 million in cash. We financed the acquisition through a combination of cash and debt drawn against our existing revolving credit facility. The results of Fox River are being reported as part of our Fine Paper segment and have been included in our consolidated financial results since the acquisition date."

47.     Moreover, the annual report also notes how Neenah Paper intended to value the Fox River Paper assets and liabilities, including a $2.1 million liability for "environmental cleanup and monitoring" obligations inherited from Fox River Papers.  In fact, Neenah Paper has a landing page on its website entitled "Fox River Acquisition Frequently Asked Questions (FAQ)."

### d.  1992-1993
### (Badger Paper Mills, Inc.)

48.     As noted above, Badger Paper purchased the Site in April 1992.

49.     Badger Paper purchased the Site for the purpose of increasing their production of free-sheet paper, such as commonly used printer paper and business form paper products.  The State of Ohio canceled Badger Paper Mills' Articles of Incorporation/Certificate of Authority on March 12, 2009.

### *e. 1993-2001*
### *(Badger Paper Mills, Inc.)*

50.     In 1993, Badger Paper conveyed the Site to Dayton Paper Corporation ("Dayton Paper"), a Minnesota Corporation, through an agreement for sale and purchase of assets.

51.     In 1996, Dayton Paper merged with and/or through Cross Pointe Paper Corporation ("Cross Pointe") into Fraser Papers, Inc. ("Fraser Papers").

52.     Fraser Papers would later become insolvent and its liabilities were discharged through bankruptcy. Fraser Papers was dismissed from this suit per this Court's Order, which provided that this dismissal was without prejudice to Plaintiffs' claims against the remaining defendants. *See* Order of Dismissal, Docket Entry #72.

53.     Upon information and belief, Twin Rivers Paper Company Corporation ("Twin Rivers") is the successor in interest to Dayton Paper through its acquisition of Fraser Papers.

54.     Twin Rivers would later become insolvent and its liabilities were discharged through bankruptcy. Twin Rivers was also dismissed from this suit per this Court's Order, which provided that this dismissal was without prejudice to Plaintiffs' claims against the remaining defendants. *See* Order of Dismissal, Docket Entry #101.

55.     Upon information and belief, Dayton Paper and Fraser Papers were the last entities that operated the Site as a paper mill.

### *f. 2001-2010*
### *(Brownfield Charities)*

56.     In 2001, Fraser Papers conveyed the Site to Brownfield, an Ohio Corporation.

57.     On July 1, 2010, Brownfield conveyed the Site to Garrett. At the time Garrett received title to the Site, the Site contained structurally unsafe structures, was no longer fit to be habitable, and was a hazard and menace to the public.

- 9 -

I\9754474.10

## Current Status of Former Owners and Operators

58.     Through Howard Paper Company, Inc. I, Aetna Paper, St. Regis, and Champion, and/or directly, International Paper owned and operated the Site from at least 1918 through 1972.

59.     Through Howard Paper Group, Warrior River, Howard Paper Partners, Howard Paper Mills, Inc. II, and Fox River Paper, and/or directly, Neenah Paper owned and operated the Site from 1972 to 1992.

60.     Badger Paper owned and operated the Site from 1992 to 1993.

61.     Through Dayton Papers, Cross Pointe, and Fraser Papers, and/or directly, Twin Rivers owned and operated the Site from 1993 to 2001.

62.     Brownfield owned and operated the Site from 2001 until it conveyed the Site to Garrett in 2010.

## The Operation and Contamination of the Site

63.     Paper is uniformly produced through a process of pulp blending, draining and drying; however, the materials used in the paper making process and the preparation of those materials vary greatly, creating many different types of paper.

64.     Between 1918 and 1989, white and colored paper was produced at the Site from pulp that was prepared off-site.  The on-Site work involved pouring the watery, already prepared pulp mix into the headbox of the Fourdinier machine and removing the water from the pulp through gravity and vacuums as the pulp moved over a belt.  The paper was then pressed together through a series of rollers, which also acted to remove any excess water.  The paper then moved through a series of steam heated rollers to dry.  Coatings, such as gloss, color, brilliance, and other desired features, would be applied at that point.

65.     At the Site, the water released during this process included fibers and additives.

- 10 -

I\9754474.10

66. When the Site transitioned to the production of recycled paper in 1989, the operator began preparing the used material for the paper making process on-Site. On-Site preparation continued thereafter until paper was no longer produced at the Site.

67. From 1989 to at least 1993, on-Site preparation began with the placement of recycled waste or "broke" into a pulper. The pulper utilized blades to cut the pieces of waste paper while water, chemicals and heat were added to aid in the process of reducing the paper to its original state. The broke, which would now be an oatmeal-like mixture, was then screened to remove unwanted particles. The mixture was then cleaned to further remove unwanted particles like the coatings and additives that were added to the original paper. A de-inking process was used to further purify the pulp from any adhesives or dyes that still remained in the fibers. Before proceeding to the paper machine, the broke was then treated with bleaching agents to brighten or whiten the pulp.

68. Throughout the operational history of the Site, the paper production process required the use of hazardous substances and chemicals. The heavy machinery that was used required significant amounts of water and heat, which required that the machines on-Site be insulated with asbestos. To prevent corrosion and maintain capacity, care of the machines included parts-washing, a process which used trichloroethylene (TCE). Asbestos and TCE are hazardous substances found at the Site.

69. The chemical pulping process used at the Site involved well known chemicals found in bleaching agents. At various times, the Site produced white bond and writing paper. Elemental chlorine, widely used until the 1990s, would have been added to achieve the brilliant white color demanded by the market. Earlier production would have involved the use of bleaching additives to the broke to produce a white finish. Bleaching agents would have been

- 11 -

released into the air as the paper proceeded through the drying process.  The virgin pulp added to the broke mixture also would have been treated with other bleaching agents and chemicals.

70.     The paper-making process also used significant amounts of energy, which required transformers on the Site.  Releases and leaks from transformers led to significant PCB contamination of the Site.  The energy demand also resulted in contamination of the Site from fuel oil and coal leachate.

71.     Chromium is used in the manufacturing of dyes and found in synthetic materials. The recycled waste containing Chromium and Barium would have been released from the waste during the de-inking process, separating, then floating above the saturated broke.  Chromium is insoluble in water and would have been removed with the floating, unwanted particles during the de-inking process and disposed of.  Barium would have been drained with the remaining water and treated.

72.     Polycyclic Aromatic Hydrocarbons (PAHs) were found on the Site.  PAHs can be produced when petroleum or coal was partially burned.  Coal and petroleum, which were used as heat and fuel sources on the Site, were found in significant quantities at the Site.  Additionally, PAHs would have been released from the ash residue of the coal used to power the paper drying process.  Benzo (a) anthracene, Benzo(a)pryene, Benzo(b)fluoranthene, Chrysene, Pyrene, Dibenz (a,h)anthracene, Indeno(1,2,3-cd) pyrene, and phenanthrene are PAHs and were found in the soil at the Site.  Flouranthene is found in coal tar and found in the soil at the Site.

73.     The operations at the Site also utilized asbestos containing building material, above-ground storage tanks for fuel oil, an oil pump house, a machine shop, two gasoline above-ground storage tanks, a former tool manufacturing facility, two hydraulic machines, a PCB capacitor, a powerhouse and air compressor, a 300 horse power engine, a used oil tote stored on-

- 12 -

Site, a hydraulic man-lift, a hydraulic elevator, a coal storage area, and PCB content in oils and greases.

74.     Asbestos, TCE, PAHs and PCBs are hazardous substances under the Ohio Voluntary Action Program ("VAP"), Ohio Revised Code ("ORC") § 3746 and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9602.

75.     Each of the hazardous substances used or produced at the Site were disposed of, dumped, discharged, deposited, spilled, placed, and/or leaked at the Site, and into the environment, by the owners and operators of the paper mill from at least 1918 to as late as 2010.

76.     In addition, all of the owners and operators of the paper mill generated hazardous substances, as outlined above, that were disposed of at the Site during the operation of the paper mill.

77.     Additional discovery may demonstrate that the owners and operators of the paper mill also arranged for the disposal and further contamination of the Site with hazardous substances during the course of their operation of the paper mill at the Site.

**Remediation of the Site**

78.     Garrett purchased the Site in 2010. At that time, the remnants of several buildings and a large smoke stack remained, and the Site was a hazard and danger to the public.

79.     Beginning in 2010, Garrett, the DSA, and the City of Dayton undertook efforts to remediate the contamination of the Site and protect public health and safety. Such efforts included, without limitation, the following:

        a.   identifying potential sources of contamination;

        b.   investigating the nature and extent of contamination;

- 13 -

    c.   preparing a remedial plan;

    d.   conducting the remedial activities; and

    e.   causing a No Further Action letter to be prepared.

80.    Such activities were conducted in accordance with VAP Standards and CERCLA's National Contingency Plan, and with public participation.

81.    Garrett, the DSA, and the City of Dayton each participated in these efforts to investigate and remediate the conditions at the Site, and each Plaintiff incurred costs or expended monies in this effort for which recovery is sought in this action.

82.    Each step in the investigation and remediation process was reviewed and approved by Garrett, the City of Dayton, and the DSA, and the costs incurred were consistent with the National Contingency Plan.

83.    In connection with such activities, Garrett, the City of Dayton, and the DSA expended in excess of $1.7 million.

## Assignment By City of Dayton

84.    As noted above, the City of Dayton entered into the Assignment with Garrett and the DSA in 2015.

85.    Pursuant to the Assignment, the City of Dayton assigned to Garrett and the DSA any and all claims, demands and causes of action against the Defendants hereto that relate in any way to the Site that is the subject of this lawsuit.

86.    The Assignment includes those claims and causes of action that are the subject of the instant matter.

I\9754474.10

**Past and Future CERCLA Response Costs and Contribution**

87.   Through paper-making operations, hazardous substances were disposed of at the Site during International Paper's ownership or operation of the Site and Neenah Paper's ownership or operation of the Site within the meaning of § 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

88.   The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

89.   During Defendants' operations, there were releases, disposals, and disposals that lead to releases of hazardous substances at the Site, including, but not limited to, PCBs, PAHs, asbestos, and TCE, within the meaning of §§ 101(22) and 101(14) of CERCLA, 42 U.S.C. §§ 9601 (22), (14).

90.   As a result thereof, Plaintiffs should be entitled to recover the necessary costs of response, including, but not limited to, Phase I and Phase II reports, soil and groundwater sampling, and the general remediation work that was approved by all concerned.

91.   All of the response costs incurred at the Site were incurred consistent with the National Contingency Plan, 42 U.S.C. § 9605(a) and codified at 40 CFR Part 300.

92.   Sections 107(a) (2) and (a) (4) (B) of CERCLA, 42 U.S.C. §§ 9607(a) (2), (a) (4) (B), provide that any person who at the time of disposal of any hazardous substance owned or operated a facility at which such hazardous substances were disposed of is liable to "any person" who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the National Contingency Plan. As such, Defendants are jointly and severally liable to Plaintiffs for all necessary costs of response under CERCLA §§ 107(a)(2), (a)(4) (B), 42 U.S.C. §§ 9607(a)(2), (a)(4)(B).

- 15 -

93. Plaintiffs are also entitled to statutory interest pursuant to CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).

94. Plaintiffs are also entitled to recover certain legal fees and litigation costs pursuant to CERLCA.

## Voluntary Action Program Response Costs

95. Investigations and remediation of hazardous substance contamination at the Site were conducted in accordance with Ohio's VAP, codified at ORC § 3746, and applicable regulations. A No Further Action (NFA) letter was issued on February 13, 2012 and a Covenant Not to Sue was granted on July 5, 2012.

96. Garrett, the City of Dayton, and the DSA have incurred or expended in excess of $1.7 million in the course of conducting a voluntary action pursuant to ORC § 3746.23(A). Plaintiff Garrett has further incurred significant legal fees and expenses associated with this action.

97. The VAP activities addressed hazardous substances released and disposed of by each of the Defendants during their respective ownership and/or operation of the Site. The substances released included, but were not limited to, asbestos, TCE and PCBs, which are considered hazardous substances under ORC § 3746.01(I).

98. Based on these facts, Defendants are liable for the costs of the voluntary action under ORC §§ 3746.23(A) (1-7), (B), including, but not limited to, investigative work, preparation of Phase I and Phase II reports, remedial activities, reasonable attorneys' fees, and other expenses associated with this action.

- 16 -

**Nuisance**

99.    The acts, omissions and conduct of Defendants, collectively and individually, created and maintained a continuing nuisance at the Site.

100.    The operations of the International Paper and Neenah Paper defendants so impacted the structures and environment at the Site with contaminants that their actions continued to pose a hazard at the Site years after the paper mill operation ceased, and these defendants did nothing to warn future owners or operators, or to mitigate or abate the situation.

101.    Subsequent owners and operators of the Site knew or should have known through the exercise of reasonable care that the conditions at the Site were hazardous, yet they did nothing to mitigate or abate the situation.

102.    Plaintiffs, directly and through their assignee, expended abatement costs and incurred other damages as result of the nuisance.

103.    Plaintiffs are entitled to recover such costs and damages under common law principles and/or the ORC.

**Demand for Relief**

WHEREFORE, Plaintiffs demand: (1) a judgment against all Defendants jointly and severally in  the amount of all costs incurred relating to the Site, with interest; (2) the attorneys' fees and costs incurred in prosecuting this action; and (3) such additional and further relief that the Court deems appropriate.

I9754474.10

Respectfully submitted,


MICHAEL DEWINE
OHIO ATTORNEY GENERAL

*s/ Brent W. Huber  (w/consent)*

Trial Attorney for Plaintiff, the Ohio
Development Services Agency


*s/ Brent W. Huber*
Brent W. Huber (admitted *pro hac vice*)
TRIAL COUNSEL
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282
T:  317-236-5942
F:  317-592-4822
brent.huber@icemiller.com

*Trial Counsel for Plaintiffs Garrett Day LLC and
the Ohio Development Services Agency*

*Co-Counsel:*
Nicholas B. Reuhs (*pro hac vice*)
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282
T:  317-236-2160
F:  317-592-4738
Nicholas.Reuhs@icemiller.com

Nicole R. Woods          (0084865)
ICE MILLER, LLP
250 West Street
Columbus, Ohio 43215
T:  614-462-2319
F:  614-232-6883
Nicole.Woods@icemiller.com

- 18 -

I9754474.10

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 24, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties of record.

*s/ Brent W. Huber*
Brent W. Huber

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs request a jury trial for all issues so triable.

Respectfully submitted,

*s/ Brent W. Huber*
Brent W. Huber

- 19 -

I\9754474.10