GARRETT DAY, LLC, *et al.*,     :

     Plaintiffs,

     v.     :     Case No. 3:15-cv-36

INTERNATIONAL PAPER CO., *et al.*,     :     JUDGE WALTER H. RICE

     Defendants.     :

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT BROWNFIELD CHARITIES, INC. (DOC. #214); OVERRULING WITHOUT PREJUDICE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOCS. ##206, 213, 221), TO THE EXTENT THAT THEY ARE BASED ON PLAINTIFFS' ALLEGED FAILURE TO PRESENT EVIDENCE THAT HAZARDOUS SUBSTANCES WERE DISPOSED OF OR RELEASED AT THE SITE DURING DEFENDANTS' OWNERSHIP OR OPERATION; OVERRULING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS HPP, INC., HPM INVESTORS, INC., AND HARRISON HOLDINGS LIMITED PARTNERSHIP WITH RESPECT TO THE CERCLA CLAIM, AND DIRECTING PLAINTIFFS TO SHOW CAUSE WITHIN 14 DAYS WHY THE COURT SHOULD NOT SUSTAIN THE HPP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE OHIO VAP CLAIM (DOC. #206); SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS FOX VALLEY CORPORATION, FOX RIVER PAPER COMPANY, FOX RIVER PAPER SALES COMPANY, AND NEENAH, INC., AS IT RELATES TO SUCCESSOR LIABILITY (DOC. #213); OVERRULING DEFENDANT INTERNATIONAL PAPER COMPANY'S MOTION FOR SUMMARY JUDGMENT ON FACTS (DOC. #221); OVERRULING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR LEAVE (DOC. #250); PLAINTIFFS TO SERVE AMENDED REQUESTS FOR ADMISSION BY APRIL 15, 2019; COUNSEL TO SUBMIT JOINT REVISED RULE 26(f) REPORT BY APRIL 22, 2019; CONFERENCE CALL SET FOR APRIL 30, 2019, AT 5:00 P.M.

Plaintiffs, Garrett Day, LLC, and Ohio Development Services Agency, filed suit against numerous entities under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, and Ohio's Voluntary Action Program ("VAP"), Ohio Revised Code § 3746.23, seeking to recover expenses incurred in cleaning up hazardous waste at the site of the former Howard Paper Mill in Dayton, Ohio ("the Site").

This matter is currently before the Court on Motions for Summary Judgment filed by: (1) Defendants HPP, Inc., HPM Investors, Inc., and Harrison Holdings Limited Partnership (the "HPP Defendants"), Doc. #206; (2) Defendants Fox Valley Corporation, Fox River Paper Company, Fox River Paper Sales Company, and Neenah Paper, Inc. (the "Neenah/Fox Defendants"), Doc. #213; (3) Defendant Brownfield Charities, Inc. ("BCI"), Doc. #214; and (4) Defendant International Paper Company ("IPC"), Doc. #221. Also pending is Plaintiffs' Motion for Leave to Obtain in Excess of 40 Requests for Admission, Doc. #250.

## I.    Background and Procedural History

This case involves the Site of a former paper mill located on Edwin C. Moses Boulevard in Dayton, Ohio. The Howard Paper Mill, which also contained an on-site power plant, operated for over one hundred years, from approximately 1896 to 1996. During that time, its ownership and operation passed through the hands of many different entities. In 2001, Brownfield Charities, Inc. ("BCI"), acquired the

Site and, in 2010, Garrett Day, LLC, bought the abandoned property for $135,000.

The City of Dayton then applied for, and received, a Clean Ohio Revitalization Fund ("CORF") grant to redevelop the abandoned paper mill Site, which the City deemed "an eyesore and potential health hazard." Doc.#221-4, PageID##2506, 2520-45. The grant, for $1.184 million dollars, was administered by the Ohio Development Services Agency ("ODSA"). The City, along with its development partner, Garrett Day, used the grant money to demolish the buildings and prepare the Site for resale and redevelopment. Garrett Day contributed over $400,000 in matching funds.

A variety of hazardous substances, including asbestos, trichloroethylene ("TCE"), Polycyclic Aromatic Hydrocarbons ("PAHs"), and Polychlorinated Biphenyls ("PCBs"), alleged by-products of the paper-making process, were found at the Site. Garrett Day worked with ODSA and the City of Dayton to identify the sources, nature and extent of the contamination, to prepare a remedial plan, and to clean up the Site. The remedial plan was approved by the Ohio Environmental Protection Agency and a "No Further Action" letter was issued on February 13, 2012. Garrett Day is currently attempting to resell the property.

In January of 2015, the City of Dayton assigned "all of its rights, claims and causes related to the Recovery Claims" to Garrett Day and ODSA. Doc. #221-8,

PageID##2574-77.[1] Garrett Day and ODSA then filed suit against all of the previous owners and operators of the paper mill, seeking to recover response costs under CERCLA and the Ohio VAP.

The Court set two deadlines for filing motions for summary judgment. The first was for motions based solely on factual or legal issues that did not require any expert witness testimony. The second was for motions that did require expert witness testimony. This matter is currently before the Court on non-expert motions for summary judgment filed by the HPP Defendants (Doc. #206), the Neenah/Fox Defendants (Doc. #213), BCI (Doc. #214), and IPC (Doc. #221).

## II.    Fed. R. Civ. P. 56

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a

---

[1]  IPC notes that the Assignment was signed by Garrett Day and ODSA and approved by the Commission of the City of Dayton in January of 2015. However, because the Assignment was not fully executed by the City until November 21, 2017, it, by its terms, did not become effective until that date. Doc. #221-8, PageID#2576. John Musto, Chief Trial Counsel for the City of Dayton, explained that the City Manager signed it in November of 2017, because the City was unable to find a fully executed copy of the Assignment. Doc. #259, PageID#4240.

genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must

5

assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Analysis

### A. Relevant Statutes

Plaintiffs seek to recover their response costs through CERCLA, 42 U.S.C. § 9607. CERCLA was enacted with the broad remedial purpose of facilitating prompt cleanup of hazardous waste sites and shifting the cleanup costs to those responsible for the contamination. *Burlington N. and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). To accomplish this, "Congress cast the liability net wide to capture all potentially responsible parties." *Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 135 (3d Cir. 2001).

CERCLA provides, in relevant part, that "any person who at the time of disposal of any hazardous substance owned or operated a facility at which such hazardous substances were disposed of," 42 U.S.C. § 9607(a)(2), "[shall be liable for] any other necessary costs of response incurred by any other person consistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(B).

Plaintiffs also seek to recover their response costs through Ohio's Voluntary Action Program ("VAP"). The VAP statute provides, in relevant part:

> Any person who, at the time when any of the hazardous substances identified and addressed by a voluntary action conducted under this chapter and rules adopted under it were released at or upon the property that is the subject of the voluntary action, was the owner or operator of the property, and any other person who caused or contributed to a release of hazardous substances at or upon the property, is liable to the person who conducted the voluntary action for the costs of conducting the voluntary action. If the person who conducted the voluntary action did not cause or contribute to any release of hazardous substances at or upon the property that were identified and addressed by the voluntary action, he may recover in a civil action the costs of conducting the voluntary action from the owners or operators of the property at the time when those releases occurred and the other persons who caused or contributed to the releases.

Ohio Rev. Code § 3746.23(B). A plaintiff, however, cannot recover from "[a] person who neither caused nor contributed to in any material respect a release of hazardous substances on, in, or under the property . . . nor who expressly undertook contractual liability for conducting the voluntarily action." Ohio Rev. Code § 3746.23(G)(1).

**B.     Brownfield Charities, Inc. (Doc. #214)**

When Brownfield Charities, Inc. ("BCI") acquired the Site in 2001, the paper mill was no longer operational.  In its Motion for Summary Judgment, Doc. #214, BCI argues that, because it neither owned nor operated the Site at the time that the hazardous substances at issue were allegedly disposed of or released thereon, it cannot be held liable under CERCLA or Ohio's VAP.  Plaintiffs concede that BCI is not liable for the response costs, and do not oppose the motion.

Defendant International Paper Company ("IPC"), however, opposes BCI's motion.  Doc. #235.  IPC notes that, during the period that BCI owned the property, the City of Dayton declared the Site to be a public nuisance and brought criminal charges against BCI and its principal, Anthony Staub.  In July of 2003, the Dayton Fire Department responded to reports of a leaking transformer that was on fire at the Site.  From 2003 to 2009, the Dayton Fire Department issued numerous citations because the homeless individuals were camping at the vacant building on the Site, sometimes starting fires.

IPC maintains that, because the public nuisance conditions that led to Plaintiffs' voluntary action were created while BCI owned the property, BCI is not entitled to summary judgment.  The Court rejects this argument.  Plaintiffs do not claim that BCI caused or contributed to contamination at the Site and the Court has dismissed Plaintiffs' public nuisance claim.  Doc. #161.  Regardless of whether BCI's neglect prompted Plaintiffs' clean-up efforts, there is simply no legal basis for

8

holding BCI liable for the alleged contamination. It neither owned nor operated the Site at the time the hazardous substances were allegedly disposed of or released.

Accordingly, the Court SUSTAINS BCI's Motion for Summary Judgment, Doc. #214, and dismisses all claims against BCI with prejudice.

## C. Other Summary Judgment Motions (Doc. ##206, 213, 221)

The HPP Defendants, the Neenah/Fox Defendants and IPC have also filed motions for summary judgment, Docs. ##206, 213, 221. As an initial matter, the Court must address the scope of the arguments raised in those motions.

### 1. Scope of Issues

One of the grounds asserted by each of the Defendants in their motions for summary judgment is that Plaintiffs have failed to produce any evidence supporting a finding that hazardous substances were, in fact, disposed of or released at the Site during the time periods that Defendants or their predecessors owned or operated the Site. Defendants correctly note that it is not enough for Plaintiffs to prove that the hazardous substances found at the Site in 2010 were the same type of hazardous substances generally used in the paper-making process. A defendant cannot be held liable unless Plaintiffs prove that those hazardous substances were actually "disposed of" or "released" at the Site during that defendant's ownership or operation of the paper mill.

Plaintiffs maintain that the hazardous substances found at the Site were byproducts of the paper-making process. Nevertheless, at his deposition, Michael

Heitz, Garrett Day's 30(b)(6) representative, testified that, while he was generally aware that disposals of hazardous substances took place, he could not testify about specific disposals or releases without relying on expert witness testimony. Doc. #207, PageID##1988, 1999-2002, 2008-10. Other Plaintiffs' witnesses likewise deferred to the experts on this subject. Doc. #220, PageID#2379; Doc. #216, PageID#2188.

Defendants argue that before the Court can consider expert witness testimony, Plaintiffs must first present evidence to support a finding that hazardous substances were, in fact, disposed of or released at the Site during the relevant time periods. They have not yet done so. According to Defendants, Plaintiffs cannot rely solely on expert testimony to remedy this defect.

The Court acknowledges that Plaintiffs must present evidence showing that hazardous substances were released or disposed of during each Defendant's ownership or operation of the Site. Nevertheless, given that the contamination at issue in this case allegedly dates back more than a century and spans many decades, the mere non-surprising fact that Plaintiffs' lay witnesses could not identify specific dates of releases or disposals of hazardous substances does not warrant summary judgment at this juncture. An expert witness, knowledgeable not only about the hazardous substances found at the Site, but also about the paper-making processes, environmental regulations and typical disposal practices, as they existed during each relevant time period, may be able to establish the requisite causal connection.

In support of their motions, Defendants cite to *Kalamazoo River Study Group v. Rockwell International Corp.*, 171 F.3d 1065 (6th Cir. 1999), a CERCLA case in which the Sixth Circuit affirmed the district court's order granting summary judgment in favor of the defendant manufacturer. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court had rejected the plaintiff's expert witness's conclusions concerning the defendant's role in the contamination as lacking an adequate factual basis. This expert had based his opinion on a factual assumption that was purely speculative. Under these circumstances, the court found that the expert witness's opinion was insufficient to create a genuine issue of material fact on the issue of causation. *Id.* at 1072-73.

That case, however, is procedurally distinguishable. There is no question that an expert witness's opinion must be based on "sufficient facts or data." *See* Fed. R. Evid. 702(b). In this case, however, the Court has not yet seen the expert witness reports. They will be the subject of the second round of summary judgment motions. If Plaintiffs' expert witness reports lack an adequate factual basis, Defendants, of course, are free to challenge them on that basis, either in their next motions for summary judgment or in a separate *Daubert in limine* motion.

Nevertheless, at this juncture, to the extent that Defendants seek summary judgment based on Plaintiffs' alleged failure to produce evidence that hazardous substances were, in fact, disposed of or released at the Site during Defendants' ownership or operation of the paper mill, the Court OVERRULES each of those

11

motions, Docs. ##206, 213, 221, WITHOUT PREJUDICE to reasserting this argument in the next round of summary judgment motions. The Court turns now to the other grounds for summary judgment individually asserted by Defendants.

## 2. HPP Defendants (Doc. #206)

HPP, Inc. (formerly Howard Paper Partner, Inc.), HPM Investors Inc. (formerly Howard Paper Mills, Inc.) and Harrison Holdings Limited Partnership (collectively "the HPP Defendants") operated the paper mill at the Site from 1971 to 1991. In their Motion for Summary Judgment, Doc. #206, the HPP Defendants argue that they are not "persons" for purposes of liability under CERCLA or VAP, because each legal entity is now "dead and buried."

A legal entity is considered to be "dead" when it has been dissolved but still has assets that can be reached. It is considered to be "dead and buried" when it has been dissolved and has no remaining assets. *AT&T Global Info. Solutions Co. v. Union Tank Car Co.*, No. C2-94-876, 1998 U.S. Dist. LEXIS 19410, at *6 (S.D. Ohio July 6, 1998).

Each of the HPP Defendants was dissolved on June 29, 1992. Doc. #206, PageID##1876-87. Frederick W. Harrison, whose father, Ward, created each of the HPP Defendants, declared that he believes that all assets were distributed within the 1992 calendar year. *Id.* at PageID##1892-94.[2] The HPP Defendants

---

[2] At their depositions, Frederick Harrison and his sister, Lynn Harrison, each testified that they did not recall any specifics of the distribution other than the fact that the remaining assets were split between the three siblings and possibly their mother. Doc. #223, PageID#2602; Doc. #225, PageID#2740. Despite claiming

12

maintain that because these legal entities are "dead and buried," they are no longer "persons" subject to liability under CERCLA or the Ohio VAP.

CERCLA, however, does not exclude dissolved corporations or dissolved partnerships from the definition of "person." *United States v. SCA Servs. of Ind., Inc.*, 837 F. Supp. 946, 954 (N.D. Ind. 1993). Given CERCLA's broad remedial purpose, it is unlikely that Congress intended to exclude dissolved legal entities from liability. *Canadyne-Georgia Corp. v. Cleveland*, 72 F. Supp. 2d 1373, 1382 (M.D. Ga. 1999). Dissolution "does not alter the fact that such an entity may have contributed to the disposal of hazardous materials," and excluding a dissolved entity from liability "would thwart a primary purpose of the statute." *Id. See also Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 201 (E.D.N.Y. 1997) ("There is no indication in CERCLA that liability . . . depends upon whether the defendant corporation is a person at the time of suit. Rather, because liability is triggered by the disposal of hazardous waste, the only logical conclusion is that CERCLA 'personhood' is also measured as of the time of this triggering event.").

Moreover, CERCLA preempts state laws dealing with capacity to sue and be sued. *Canadyne-Georgia*, 72 F. Supp. 2d at 1383; *BASF Corp. v. Central Transp., Inc.*, 830 F. Supp. 1011, 1013 (E.D. Mich. 1993). Accordingly, it is of no import that state law may prohibit a dissolved legal entity from being sued under CERCLA.

_____

that there is a genuine issue of material fact as to whether the HPP Defendants have any remaining assets, Plaintiffs have produced no evidence to rebut this testimony.

Although the HPP Defendants concede this point, they nevertheless argue that a dead and buried corporation cannot be held liable. They rely heavily on *AT&T Global Information Solutions Co.*, in which the court held that "[o]nce a corporation is 'dead and buried', it is no longer a 'person' under CERCLA and no lawsuit brought pursuant thereto can be maintained against it." 1998 U.S. Dist. LEXIS 19410, at *6.

A variety of district courts from around the country have adopted this view. *See Hillsborough Cty. v. A&E Rd. Oiling Serv., Inc.*, 877 F. Supp. 618, 622 (M.D. Fla. 1995) (holding that CERCLA liability may not be imposed on dead and buried corporations); *Ekotek Site PRP Comm. v. Self*, 881 F. Supp. 1516, 1531 (D. Utah 1995) ("a dissolved corporation holding no valuable assets is not a person within the meaning of CERCLA."); *BASF Corp.*, 830 F. Supp. at 1013 (although CERCLA preempts state laws concerning capacity to be sued, CERCLA liability cannot attach to a dissolved corporation with no remaining assets); *Stychno v. Ohio Edison Co.*, 806 F. Supp. 663, 670 (N.D. Ohio 1992) ("Whether an inactive corporation falls with the scope of the definition of 'person' under CERCLA necessarily depends upon whether that corporation still holds assets. If it does not, any judgment entered against it would be futile.").

Nevertheless, other district courts have held that CERCLA actions may be pursued against dead and buried legal entities. In *United States v. SCA Services of Indiana, Inc.*, the court held that "CERCLA allows suits against corporations without limitation as to whether the corporation is dissolved or its assets have

14

been distributed." 837 F. Supp. at 953. As the court noted in *Canadyne-Georgia Corp.*, "[w]hether a partnership or corporation has assets to satisfy a judgment is irrelevant to the antecedent question of whether such an entity can be found liable under CERCLA." 72 F. Supp. 2d at 1384. "[T]he fact that a defendant may be judgment proof does not affect its capacity to be sued." *Id.* (quoting *United States v. Sharon Steel Corp.*, 681 F. Supp. 1492, 1499 (D. Utah 1987)). "[L]iability and collectability are two separate and distinct concepts." *Town of Oyster Bay*, 987 F. Supp. at 202.

At this stage of the litigation, the only question is whether the HPP Defendants' "dead and buried" status entitles them to summary judgment on Plaintiffs' CERCLA claims. As the court noted in *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, No. 86C20377, 1990 WL 322940 (N.D. Ill. July 6, 1990), although it may be difficult to collect on a judgment against a corporation that has already distributed all of its assets, such a corporation "is not placed on a different definitional plane by reason of the distribution. It should be reiterated that no qualifications or limitations are placed on the definition of the term 'corporation' in CERCLA." *Id.* at *5.

A few courts have held that, even though the "scope of CERCLA liability must not turn on the collectability of judgments," the practical difficulty of collecting a judgment from a dissolved corporation that has distributed all of its assets justifies a finding that a "dead and buried" corporation is not amenable to suit under CERCLA. *AM Props. Corp. v. GTE Prods. Corp.*, 844 F. Supp. 1007,

15

1013-15 (D.N.J. 1994); *Traverse Bay Area Intermediate Sch. Dist. v. Hitco, Inc.*, 762 F. Supp. 1298, 1301-02 (W.D. Mich. 1991).

In this case, however, Plaintiffs maintain that a judgment against the HPP Defendants would not necessarily be uncollectible. Although the HPP Defendants disagree, Plaintiffs suggest that there may be old insurance policies that could cover any environmental liabilities of the HPP Defendants. Plaintiffs also suggest that it may be appropriate to pierce the corporate veil or to impose successor liability on Fox River.

At this stage of the litigation, the Court need not determine whether a judgment issued against the HPP Defendants would be futile, or which party or parties would be responsible for attempting to collect such a judgment or the manner in which that might be accomplished. Based on the above-cited cases, the Court concludes that even if the HPP Defendants are "dead and buried," they are not exempt from liability under CERCLA. Accordingly, the Court OVERRULES the HPP Defendants' Motion for Summary Judgment on the CERCLA claims.

The HPP Defendants' "dead and buried" status may, however, warrant summary judgment on the VAP claim asserted against them. As the parties note, there appears to be no case law concerning whether a "dead and buried" corporation is a "person" subject to liability under Ohio's VAP. As with CERCLA, the VAP does not exclude dissolved legal entities from the definition of "persons" subject to liability. Plaintiffs therefore argue that the same reasoning should apply. Not necessarily.

Unlike CERCLA, a federal statute which preempts state law concerning capacity to sue and be sued, Ohio's VAP appears to be subject to the confines of Ohio Revised Code § 1701.88(B), which requires suit to be brought against a dissolved corporation within 5 years of the date of dissolution. In this case, the HPP Defendants were dissolved in 1992; however, Plaintiffs did not file suit until 2013. The parties did not address this issue in their briefs. Accordingly, Plaintiffs are directed to SHOW CAUSE in writing, within 14 calendar days of the date of this Decision and Entry, why the Court should not sustain the HPP Defendants' Motion for Summary Judgment on the VAP claim.

### 3. Neenah/Fox Defendants (Doc. #213)

The Court turns next to the Neenah/Fox Defendants' Motion for Summary Judgment, Doc. #213. On June 1, 1991, Fox Valley Corporation, Fox River Paper Company and Fox River Paper Sales Company (collectively "Fox River") entered into an Asset Purchase Agreement ("APA") with the HPP Defendants. The APA authorized Fox River to continue manufacturing paper at the Site and to market products under the Howard Paper trade name.[3] Doc. #213-1, PageID##2047-77. Howard Paper Group, however, retained ownership of the real property and leased the premises and one of its paper machines to Fox River. Doc. #213-4, PageID##2092-98.

---

[3] Urbana MSC, Inc., another entity related to the HPP Defendants, was also a party to the APA.

Fox River operated the paper mill for less than one year. On April 10, 1992, Badger Paper Mills, Inc., purchased all Site-related assets from Fox River. Doc. #213-7, PageID##2103-12. At the same time, Harrison Holdings Limited Partnership sold the real property and the one remaining paper machine to Badger Paper Mills, Inc. Doc. #213-6, PageID##2099-2102.

### a. Liability for 1991-1992

In the lease, Fox River agreed to indemnify the HPP Defendants for environmental liabilities arising during the time that Fox River operated the Site but the HPP Defendants still owned it. Doc. #213-4, PageID##2094-95. Neenah, Inc., acquired Fox River in 2007. The Neenah/Fox Defendants concede that they are potentially responsible parties with respect to hazardous substances that were allegedly released or disposed of at the Site from June 1, 1991, until April 10, 1992. They argue, however, that they are entitled to summary judgment on this portion of the claim because Plaintiffs have failed to present evidence supporting a finding that hazardous substances were released or disposed of at the Site during this 1991-92 time period.

For the reasons set forth above, the Court OVERRULES this portion of the motion WITHOUT PREJUDICE to reasserting this argument in the next round of summary judgment motions, when expert witness testimony may be considered.

### b. Successor Liability for 1971-91

The Neenah/Fox River Defendants also seek summary judgment on the question of their successor liability for hazardous substances released or disposed

of at the Site from 1971 to June of 1991, when the HPP Defendants owned and operated the paper mill. Under CERCLA, "a successor corporation may be liable for the CERCLA liabilities of the predecessor corporation." *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 654 (S.D. Ohio 2002); *United States v. Mexico Feed & Seed Co., Inc.*, 980 F.2d 478, 487 (8th Cir. 1992) (holding that "successor corporations are subsumed within the plain meaning of the term 'corporation'").

Successor liability is determined by state law. *Cytec Indus.*, 196 F. Supp. 2d at 654. As a general rule, under Ohio law, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 346, 617 N.E.2d 1129, 1132 (1993). There are, however, four recognized exceptions to this rule, including a transaction that "amounts to a *de facto* consolidation or merger." *Id.* at 347, 617 N.E.2d at 1132. "A *de facto* merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Id.* at 349, 617 N.E.2d at 1134. The four hallmarks of a *de facto* merger are:

> (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations.

*Id.*

The Supreme Court of Ohio has recognized that the second hallmark—a continuity of shareholders resulting from a sale of assets in exchange for stock—is "arguably the *sine qua non* of a de facto merger." *State ex rel. Health Care Facilities, Inc. v. Ohio Bureau of Workers' Comp.*, 80 Ohio St. 3d 642, 648, 687 N.E.2d 763, 768 (1998). *See also Welco Indus.*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. Nevertheless, no single factor is determinative, and a *de facto* merger may be found even if not all hallmarks are present. *Cytec Indus.*, 196 F. Supp. 2d at 658.

Plaintiffs maintain that the June 1, 1991, Asset Purchase Agreement ("APA") amounts to a *de facto* merger of Howard Paper and Fox River, thereby subjecting Fox River to successor liability for all disposals or releases that took place from 1972 to June of 1991 when the HPP Defendants owned and operated the paper mill. The Neenah/Fox Defendants disagree. They argue that summary judgment is warranted because Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact on the question of successor liability. They further note that the HPP Defendants have never joined in Plaintiffs' *de facto* merger theory despite the fact that it might absolve them from liability.

The first hallmark of a *de facto* merger is "continuation of the previous business activity and corporate personnel." *Welco Indus.*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. It is undisputed that Fox River continued Howard Paper's previous business activity. Fox River used the same employees and the same equipment to make the same product and continued to market it under Howard

Paper's name. Nevertheless, there was no continuation of senior management or corporate personnel. The HPP Defendants were controlled by members of the Harrison family. At the time of the APA, Howard Paper's senior management had all retired and the Harrison family members no longer had any interest in running the paper mill. Doc. #225, PageID#2738. Accordingly, while the continuation of business activity weighs in favor of a *de facto* merger, the fact that there was no carryover of corporate personnel weighs against it.[4]

The second hallmark, "arguably the *sine qua non* of a de facto merger," is continuity of shareholders resulting from a sale of assets in exchange for stock. *Welco Indus.*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. Continuity of ownership is key. In this case, none of the HPP Defendants and none of the Harrison family members received stock in Fox River. The APA was purely a cash-for-assets transaction. Because there was no continuity of ownership, this factor weighs heavily against any finding of a *de facto* merger.

The third hallmark of a *de facto* merger is "the immediate or rapid dissolution of the predecessor corporation." *Id.* In this case, the HPP Defendants continued to exist for approximately one year after the APA, ultimately selling the paper mill

---

[4] Plaintiffs note that, in *Bondex International, Inc. v. Hartford Accident and Indemnity Co.*, No. 1:03-cv-1322, 2009 WL 8632648 (N.D. Ohio Feb. 10, 2009), the court found a *de facto* merger even though there was no continuity of corporate personnel. However, as the Neenah/Fox Defendants point out, the court found that all other hallmarks were present.

and other equipment to Badger Paper Mills in April of 1992. The HPP Defendants then dissolved, effective June 29, 1992. Doc. #206, PageID##1892-95.

Plaintiffs maintain that, even though the HPP Defendants continued to exist for almost one year after the APA, they ceased all operations and existed only as shell corporations. According to Plaintiffs, the HPP Defendants remained in existence only long enough to act as the conduit for the eventual sale to Badger Paper. However, the parties have pointed to no evidence to suggest that Badger Paper's acquisition of the paper mill was contemplated by anyone at the time the HPP Defendants and Fox River entered into the APA. For nearly one year, the HPP Defendants continued to own the real property and some of the equipment.

Moreover, the APA included a noncompetition provision that prohibited the HPP Defendants, for a period of 5 years, from owning or operating any enterprise engaged in the design, manufacture, sale or distribution of "technical, printing, premium correspondence and text and cover papers." Doc. #213-1, PageID#2063. As this Court previously noted, "the very existence of a non-compete agreement is inconsistent with a theory of *de facto* merger." Doc. #161, PageID#1485. Had there been a *de facto* merger or consolidation, there would have been no need for a non-compete agreement. *See also State ex rel. Health Care Facilities, Inc.*, 80 Ohio St. 3d at 648, 687 N.E.2d at 768 (noting that the inclusion of a noncompetition clause implies that the seller of the assets remained in existence).

Ohio courts have held that "continued existence of the transferor corporation does not defeat a claim for *de facto* merger except if 'the transferor retains sufficient assets to satisfy the claims of its creditors.'" *Pottschmidt v. Klosterman*, 2006-Ohio-6964, ¶ 30, 169 Ohio App. 3d 824, 835, 865 N.E.2d 111, 119 (quoting *Crislip v. Twentieth Century Heating & Ventilating Co.* (Feb. 15, 1989), 9th Dist. No. 13721, 1989 WL 11795, at *4). Despite the HPP Defendants' claim that they fall within this exception, the Court notes that, in 1992, they sold their remaining assets to Badger Paper for $2 million. On the whole, the Court finds that because the HPP Defendants did not immediately dissolve after the APA, this weighs against the finding of a *de facto* merger.

The fourth hallmark of a *de facto* merger is that the purchasing corporation assumes "all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." *Welco Indus.*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. In this case, Fox River assumed Howard Paper Group's performance obligations to its customers, trade payables, health care and COBRA obligations to the employees, insurance contracts and all warranty liabilities. Accordingly, this factor weighs in favor of a finding of a *de facto* merger.

Although Fox River continued Howard Paper's previous business activity and assumed all liabilities and obligations ordinarily necessary to do so, the Court finds that Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find a *de facto* merger. This was strictly a cash-for-assets agreement. Howard Paper continued to exist for many months, retaining ownership of the real

property and one of the paper machines. Most importantly, when Fox River took over operation of the paper mill, there was no carryover of corporate personnel and no continuity of ownership. Under these circumstances, there is no equitable basis for imposing successor liability on Fox River under a *de facto* merger theory.

Accordingly, the Court SUSTAINS the Neenah/Fox River Defendants' Motion for Summary Judgment with respect to the question of successor liability for disposals or releases occurring from 1971-1991.[5] The Court, at this juncture, does not reach the question of whether the Neenah/Fox River Defendants are liable for contamination occurring from June of 1991 to April of 1992.

### 4. International Paper Company (Doc. #221)

Defendant International Paper Company ("IPC") has also moved for summary judgment. Doc. #221. IPC's predecessors owned and operated the Site from 1897 until 1972. IPC has conceded that it succeeded to their liabilities. Doc. #125. In its motion for summary judgment, IPC argues that: (1) the City of Dayton did not incur any response costs at the Site, rendering the purported assignment of

---

[5] In the APA, Howard Paper expressly agreed to indemnify and hold Fox River harmless for claims arising from "any Pollution caused by, or created by, or contributed to by, any one or more of the Sellers and the Partners prior to the Effective Time of Closing." Doc. #213-1, PageID##2064-65. Although CERCLA prohibits efforts to divest a responsible party of his liability, it does not prohibit indemnification agreements such as this. *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 342-43 (7th Cir. 1994) (construing 42 U.S.C. § 9607(e)). The fact that the HPP Defendants later dissolved and distributed all of their assets is largely irrelevant to the question of whether a *de facto* merger occurred such that the Neenah/Fox Defendants have successor liability.

claims to Garrett Day and ODSA a champertous agreement that is contrary to Ohio public policy and void on its face; and (2) Plaintiff ODSA has no standing to seek cost recovery because it incurred no response costs under CERCLA and no costs of conducting a voluntary action under the Ohio VAP. Neither argument has merit.

### a. Validity of Assignment of Claims by City of Dayton

IPC first challenges the validity of the City of Dayton's Assignment, to Garrett Day and ODSA, of all claims related to remediation of the Site.[6] Pursuant to that Assignment, the City may receive a portion of any judgment or settlement proceeds in this lawsuit. The amount to be received by the City depends on the amount of the Net Recovery. Doc. #221-8, PageID##2574-78.

IPC points to evidence indicating that, according to a City Manager's report, the project was funded by the CORF grant and none of the City's general fund dollars were used. Doc. #216, PageID#2182. IPC maintains that, because the City did not incur any response costs at the Site, it has no claims under CERCLA or the Ohio VAP. IPC argues that the purported Assignment therefore constitutes a champerty agreement, which is void as contrary to public policy under Ohio law. A champerty agreement exists when someone who has no bona fide interest in the case undertakes "to further another's interest in a suit in exchange for a part of the

---

[6] According to John Musto, the City did not pursue these claims on its own because it is difficult to find counsel willing to accept representation on a contingency basis. Doc. #259, PageID#4237.

litigated matter if a favorable result ensues." *Rancman v. Interim Settlement Funding Corp.*, 99 Ohio St. 3d 121, 123, 220, 789 N.E.2d 217, 219 (2003).

Here, it cannot be said that Garrett Day and ODSA have no bona fide interest in recovering response funds. Accordingly, this cannot be a champertous agreement.

Moreover, IPC's argument is also based on the premise that the City incurred no recoverable response costs. Even if the City incurred no direct expenses related to the project, the City was the recipient of the CORF grant and evidence shows that City employees expended time overseeing and facilitating the project and providing technical support. Doc. #216, PageID##2179, 2185, 2188; Doc. #259, PageID#4236. These indirect costs may be recoverable under CERCLA.

The Sixth Circuit has held that the EPA's overhead costs, including office space and personnel, are indirect costs recoverable under CERCLA. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503-04 (6th Cir. 1989). *See also Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996) (holding that CERCLA "clearly and unambiguously provide[s] for recovery of government oversight of private party remedial action"); *Santa Clara Valley Water Dist. v. Olin Corp.*, 655 F. Supp. 2d 1066, 1072 (N.D. Cal. 2009) ("The weight of authority suggests that in [a] proper case, labor costs are recoverable as a cost of response. If the labor was expended on matters addressed to the threat to human

health created by the release of a hazardous substance, then the costs of such labor should be recoverable.").

For the reasons set forth above, the Court rejects IPC's argument that the City's Assignment of claims is invalid.

### b. ODSA's Standing

IPC next argues that ODSA lacks standing to seek cost recovery under CERCLA or the Ohio VAP, because ODSA itself incurred no response costs at the Site. IPC notes that "Clean Ohio Council" is listed as the Grantor of the CORF funds; the "City of Dayton" is the Grantee. Doc. #221-5, PageID#2520. Plaintiffs note, however, that an Addendum to the grant agreement defines ODSA's predecessor, Ohio Department of Development, as the Grantor. It further provides that the Addendum "supersedes any conflicting or inconsistent terms of the Agreement." Doc. #221-5, PageID##2544-45. As explained by ODSA's 30(b)(6) designees, the Clean Ohio Council decides who should be awarded the grant funds, but ODSA is the grantor of the funds. Doc. #220, PageID#2341; Doc. #219, PageID#2298.[7] ODSA also administers the grant, reviewing the invoices submitted by the City and releasing the money for the City to pay the contractors. Doc. #220, PageID##2371, 2383. *See also* Ohio Rev. Code § 122.658(A) ("The department of development shall administer the clean Ohio revitalization fund.").

---

[7] The Court rejects IPC's argument that Clean Ohio Council is designated by statute as the Grantor of CORF funds. The relevant statute simply says that the CORF funds "shall be used to make grants or loans for projects that have been *approved* by the clean Ohio council." Ohio Rev. Code § 122.658(A).

ODSA did not pay any of the grant money directly to demolition or remediation contractors for work performed at the Site. It was funneled through the City of Dayton. Nevertheless, the funds originated from the Clean Ohio Revitalization Fund ("CORF"). ODSA is now attempting to recover those taxpayer dollars so that they can be reused for other brownfield projects. Doc. #220, PageID#2379; Doc. #219, PageID#2286.

CERCLA permits recovery of "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). A "person" is defined to include a "State" and a "political subdivision of a State." 42 U.S.C. § 9601(21). To the extent that Plaintiffs can prove that the funds provided by ODSA were "necessary costs of response" that were "consistent with the national contingency plan," it would appear that ODSA is a proper plaintiff.

Citing *Chubb Custom Insurance Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013), IPC argues that because ODSA did not incur its own response costs, but simply "reimbursed" response costs paid by the City, ODSA cannot recover under CERCLA and lacks standing to pursue these claims. In *Chubb*, the court held that the insurance company, which asserted subrogated claims under CERCLA, lacked standing because it did not incur any response costs. *Id.* at 952-53. As Plaintiffs point out, however, ODSA did not act as an insurance company that "reimbursed" the City for its response costs. Instead, the State awarded the grant money before the project began, and then disbursed those funds "in real

time" as needed so that the City could pay the contractors. Accordingly, *Chubb* is inapposite.

IPC has cited no authority indicating that a state agency that provides grant money to a municipality to clean up hazardous waste at a particular Site does not incur recoverable response costs. The Court is satisfied that ODSA has standing under CERCLA to seek recovery of the CORF grant funds that were awarded to the City of Dayton.

IPC also challenges ODSA's standing to pursue a claim under the Ohio VAP. That statute permits recovery by a "person who conducted the voluntary action." Ohio Rev. Code § 3746.23(B). IPC notes that only the City of Dayton and Garrett Day are listed as "volunteers" on the No Further Action Letter, issued on June 14, 2012, Doc. #221-6, PageID##2547-48, and on the Ohio EPA's July 5, 2012, Covenant Not to Sue, Doc. #221-7, PageID#2557. IPC argues that because ODSA is not listed as a "volunteer," ODSA cannot recover under the Ohio VAP.

ODSA maintains, however, that even though it is not listed as a "volunteer," it has standing to sue because it participated in conducting the voluntary action. Doc. #220, PageID#2375. It notes that Ohio Revised Code § 3746.23(B) does not limit recovery to those "persons" specifically identified as "volunteers." Rather, it includes anyone "who conducted the voluntary action."

Given that ODSA oversaw the voluntary action and participated in conducting it with the City and Garrett Day, the Court finds that ODSA has standing to pursue a claim under the Ohio VAP.[8]

## IV.    Outstanding Matters

### A.    Plaintiff's Motion for Leave (Doc. #250)

Still pending is Plaintiffs' motion for leave to obtain in excess of forty requests for admission from the defendants, Doc. #250.  Plaintiffs had served between 77-91 requests for admission on IPC, the Neenah/Fox Defendants and the HPP Defendants.  Defendants objected on the grounds that the requests were untimely and improper.  Doc. #251.  The Court reserved ruling on Plaintiffs' motion pending resolution of the summary judgment motions.  Doc. #254.

To the extent that the Court's above rulings on the summary judgment motions may have eliminated the need for at least some of the previously-propounded requests for admission, the Court OVERRULES WITHOUT PREJUDICE Plaintiffs' motion for leave to obtain in excess of forty requests for admission, Doc. #250.  Plaintiffs are DIRECTED to reevaluate those requests in light of this Decision and Entry.  Plaintiffs shall serve amended requests for admission on

_____

[8]    Moreover, to the extent that the City may have incurred recoverable response costs under the Ohio VAP, ODSA stands in the City's shoes by virtue of the Assignment.

Defendants no later than April 15, 2019. If Plaintiffs continue to believe that more than 40 requests for admission are necessary, they may file an appropriate motion.

### B. Amended Scheduling Order

All expert witness depositions were to have been completed by November 2, 2018. All other discovery was stayed pending resolution of the summary judgment motions decided herein. *See* Doc. #254.

Counsel is DIRECTED to submit a Joint Revised Rule 26(f) Report no later than April 23, 2019. A conference call will be held on Tuesday, April 30, 2019, at 5:00 p.m. (EDT) to finalize an Amended Scheduling Order and to set a new trial date and other dates as necessary.

## V. Conclusion

For the reasons set forth above, the Court:

- **SUSTAINS** Brownfield Charities, Inc.'s, Motion for Summary Judgment, Doc. # 214;
- **OVERRULES, WITHOUT PREJUDICE** to renewal once expert discovery has been concluded, the HPP Defendants' Motion for Summary Judgment, Doc. #206, the Neenah/Fox Defendants' Motion for Summary Judgment, Doc. #213, and IPC's Motion for Summary Judgment, Doc. #221, to the extent those motions are based on Plaintiffs' alleged failure to present sufficient evidence that hazardous substances were disposed of or released at the Site during Defendants' ownership or operation;
- **OVERRULES** the HPP Defendants' Motion for Summary Judgment, Doc. #206, with respect to the CERCLA claim, and **DIRECTS** Plaintiffs

to **SHOW CAUSE** within 14 calendar days why the Court should not sustain the HPP Defendants' motion with respect to the Ohio VAP claim;

- **SUSTAINS** the remainder of the Neenah/Fox Defendants' Motion for Summary Judgment as it relates to successor liability for years 1971-1991, Doc. #213;

- **OVERRULES** the remainder of Defendant IPC's Motion for Summary Judgment, Doc. #221;

- **OVERRULES WITHOUT PREJUDICE** Plaintiffs' Motion for Leave to Obtain in Excess of 40 Requests for Admission, Doc. #250, and **DIRECTS** Plaintiffs to serve Amended Requests for Admission no later than April 15, 2019;

- **DIRECTS** counsel to file a Joint Revised Rule 26(f) Report no later than April 22, 2019; and

- **SETS** a conference call for Tuesday, April 30, 2019, at 5:00 p.m. (EDT) to finalize an Amended Scheduling Order and to set a new trial date and other dates as may be necessary.

Date: March 25, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE